## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| Julie Karpik, Michelle Lewis, Deborah Mondell, and Robert Owen, individually and as representatives of a class of similarly situated persons, and on behalf of the Huntington Investment and Tax Savings Plan, | Case No.  2:17-cv-1153 |
| | |
| Plaintiffs, | **COMPLAINT** |
| v. | **CLASS ACTION** |
| | |
| Huntington Bancshares Incorporated, Huntington Bancshares Incorporated Board of Directors, Stephen D. Steinour, Don M. Casto III, Jonathan A. Levy, Ann B. Crane, Steven G. Elliot, Michael J. Endres, John B. Gerlach Jr., D. James Hilliker, David P. Lauer, Gerard Mastroianni, Richard W. Neu, David L. Porteous, Kathleen H. Ransier, William R. Robertson, Peter J. Kight,  Eddie R. Munson, John C. Inglis, J. Michael Hochschwender, Gina D. France, Robert S. Cubbin, Lizabeth Ardisana, and John Does 1–20, | |
| | |
| Defendants. | |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs Julie Karpik, Michelle Lewis, Deborah Mondell, and Robert Owen, individually and as representatives of the Class described herein, and on behalf of the Huntington Investment and Tax Savings Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Huntington Bancshares Incorporated ("Huntington"), the Huntington Bancshares Incorporated Board of Directors (the "Board"), individual Huntington Directors, and John Does

1–20 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries by: 1) applying a preference for Huntington products and services within the Plan, despite excessive costs compared to available options favored by similarly-sized plans; and 2) using the Plan to sustain Huntington's failing mutual fund business and leverage the Plan to Huntington's advantage in the consolidation and eventual sale of the funds. Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of the end of 2016, Americans had approximately $7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $25.3 Trillion in Fourth Quarter 2016* (Mar. 22, 2017), *available at* https://www.ici.org/research/stats/retirement/ret_16_q4. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439

2

(1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

4.      The real life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. *See* Melanie Hicken, *Your Employer May Cost You $100K in Retirement Savings*, CNN MONEY (Mar. 27, 2013), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees/. Put another way, excessive fees can force a worker to work an extra five to six years to make up for the excess fees that were paid. *Id.*

5.      For financial service companies like Huntington, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan by, for example, using proprietary investment products and administration services that a disinterested fiduciary would not choose.

6.      To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29

U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

7.     Defendants have not acted in the best interest of the Plan and its participants. Instead, Defendants used the Plan to promote Huntington's proprietary financial products and services and earn profits for Huntington. As of the beginning of 2012, 16 of the investment options in the Plan's investment menu were affiliated with Huntington, out of 21 total offerings. Defendants hitched the Plan to Huntington's products and services, even as Huntington wound down or sold associated operations and assets. Defendants failed to independently evaluate the Plan's options or consider whether participants would be better served by alternatives in the marketplace. Defendants then used their control of the Plan to position Huntington to profit from the demise of Huntington's mutual fund business. Defendants' disloyalty and imprudence has cost the Plan tens of millions of dollars since 2011. The legacy of Defendants' self-dealing continues to adversely affect participants.

8.     Based on this conduct, Plaintiffs asserts claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), failure to monitor fiduciaries (Count Two), prohibited transactions with a party-in-interest (Count Three), and prohibited transactions with a fiduciary (Count Four). Plaintiffs seek to recover losses to the Plan caused by Defendants' violations of ERISA, profits earned by Huntington as a result of prohibited transactions involving the Plan, and other appropriate relief.

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of

the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

11.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

12.     Plaintiff Julie Karpik resides in Kenai, Alaska and was a participant in the Plan from prior to 2012 until 2013. Plaintiff Karpik was invested in multiple investment options managed by Huntington's subsidiaries, and her account was recordkept by Huntington's subsidiary. Plaintiff Karpik's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

13.     Plaintiff Michelle Lewis resides in Erie, Pennsylvania and was a participant in the Plan from prior to 2012 until 2014. Plaintiff Lewis was invested in multiple investments managed by Huntington's subsidiaries, and her account was recordkept by Huntington's subsidiary. Plaintiff Lewis' account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

14.     Plaintiff Deborah Mondell resides in Ellwood City, Pennsylvania and was a participant in the Plan from prior to 2012 until 2014. Plaintiff Mondell was invested in multiple investments managed by Huntington's subsidiaries, and her account was recordkept by

Huntington's subsidiary. Plaintiff Mondell's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

15. Plaintiff Robert Owen resides in Toronto, Ohio and was a participant in the Plan from prior to 2012 until 2016. Plaintiff Owen's account was recordkept by Huntington's subsidiary. Plaintiff Owen's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

### THE PLAN

16. The Plan was established by Huntington and went into effect in 1978. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

17. The Plan covers eligible employees and former employees of Huntington and participating subsidiaries. Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis to the Plan. Employees also receive tax-deferred contributions from Huntington.

18. Plan participants may direct their accounts to one or more investment vehicles selected by Huntington. As of the end of 2011, the Plan's investment options included the Huntington Conservative Deposit Account; fifteen mutual funds managed by Huntington's subsidiary Huntington Asset Advisors, Inc. ("HAA"); Huntington common stock; and five mutual funds not affiliated with Huntington. After 2011, Huntington closed or sold its proprietary mutual funds in a series of transactions, and the Plan's investment menu changed to include new funds and legacy funds managed by the transferees of Huntington's proprietary funds. Until October 3, 2016, Huntington's subsidiary Huntington National Bank ("HNB") was

6

the recordkeeper for the Plan. HNB provided custodial, communication, and transaction-processing services to the Plan and participants.

**DEFENDANTS**

*Huntington Bancshares Incorporated*

19.     Defendant Huntington is a bank holding company headquartered in Columbus, Ohio. Huntington is the "plan sponsor" for the Plan within the meaning of 29 U.S.C. § 1002(16)(B). According to the Plan's Form 5500s, Huntington has sole discretion with respect to the Plan's investment menu. Huntington is also the Administrator of the Plan responsible for the overall operation and administration of the Plan. Huntington appoints and delegates discretionary authority to perform certain Plan administration and investment functions to one or more committees comprised of Huntington Directors (see *infra*, ¶¶ 21-22) or Huntington employees. Huntington exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A). Huntington ultimately received the revenues and profits collected by Huntington's subsidiaries for services to the Plan and the Plan's investment funds. Huntington also received revenues and profits from sales of Huntington mutual funds and the sale of HAA.

*Huntington Bancshares Incorporated Board of Directors*

20.     Huntington's Board is the governing body that oversees the activities and discharges legal obligations of Huntington, including the duties identified above with respect to the Plan (see *supra*, ¶ 19). Actions, omissions, and duties attributed to Huntington throughout this Complaint also refer to the Board. Because the Board exercises Huntington's discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, the Board is a fiduciary under 29 U.S.C. § 1002(21)(A).

7

*Huntington Directors*

21.     Defendants Stephen D. Steinour, Don M. Casto III, Jonathan A. Levy, Ann B. Crane, Steven G. Elliot, Michael J. Endres, John B. Gerlach Jr., D. James Hilliker, David P. Lauer, Gerard Mastroianni, Richard W. Neu, David L. Porteous, Kathleen H. Ransier, William R. Robertson, Peter J. Kight,  Eddie R. Munson, John C. Inglis, J. Michael Hochschwender, Gina D. France, Robert S. Cubbin, Lizabeth Ardisana (collectively, the "Huntington Directors") served on the Board during the relevant time.  The Huntington Directors exercised Huntington's discretionary authority with respect to operation and control of the Plan and management of the Plan's investment menu (see *supra* ¶¶ 19-20). Each Huntington Director is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

*John Does 1-5*

22.     Any committees or entities to whom Defendants delegated fiduciary functions or responsibilities are also fiduciaries of the Plan pursuant to 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because committees or entities that have been delegated fiduciary responsibilities are not currently known to Plaintiffs, they are collectively named as John Does 1-5.

*John Does 6-20*

23.     Any individuals not named in this Complaint to whom Defendants delegated fiduciary functions or responsibilities (by individual appointment or by appointment or service to a committee or entity identified herein as John Does 1-5) are also fiduciaries of the Plan pursuant to 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because individuals that have been delegated fiduciary responsibilities are not currently known to Plaintiffs, they are collectively named as John Does 6-20.

24.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

25.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

26.     These ERISA fiduciary duties are "the highest known to the law." *Hall Holding Co.,* 285 F.3d 415, 426 (6th Cir. 2002) (quoting *Howard v. Shay,* 100 F.3d 1484, 1488 (9th Cir. 1996)).

### DUTY OF LOYALTY

27.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the

9

interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . ." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

28.     While ERISA does not prohibit an employer's corporate officers or high-level employees from serving as plan fiduciaries—basically wearing two hats—it does require that they "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. For example, in administering an ERISA plan, corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of the pension plan." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

29.     "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in intensive and scrupulous independent investigation of their options to insure that they act in the best interests of plan beneficiaries.'" *Howard*, 100 F.3d at 1488–89 (quoting *Leigh v. Engle*, 727 F.2d 133, 125–26 (7th Cir. 1984)).

10

## DUTY OF PRUDENCE

30.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)). Indeed, the Sixth Circuit has held:

> A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options. Much as one bad apple spoils the bunch, the fiduciary's designation of a single imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty, both the duty to act as a prudent person would in a similar situation with single-minded devotion to the plan participants and beneficiaries, as well as the duty to act for the exclusive purpose of providing benefits to plan participants and beneficiaries.

*Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012), *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459.

31.     Failing to closely monitor and subsequently minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees) constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336

11

(8th Cir. 2014). Similarly, selecting and retaining higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

32.     Although ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan," that duty exists only "insofar as such documents and instruments are consistent with" the other duties imposed upon fiduciaries by ERISA. 29 U.S.C. § 1104(a)(1)(D). "This provision makes clear that the duty of prudence trumps the instructions of a plan document . . . ." *Dudenhoeffer*, 143 S. Ct. at 2468.

PROHIBITED TRANSACTIONS

33.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106. These transactions are considered "*per se*" violations because they entail a high potential for abuse.

34.     Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C)     furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

35.     Section 1106(b) further provides, in pertinent part:

> A fiduciary with respect to the plan shall not –

(1)     deal with the assets of the plan in his own interest or for his own account,

(2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

36.     "ERISA § 406(b) is specifically directed at the problem of fiduciary self-dealing and absolutely prohibits a fiduciary from acting in a conflict of interest situation where his loyalties to the plan may be compromised or divided." *Donovan v. Daugherty*, 550 F. Supp. 390, 403 (S.D. Ala. 1982).

## SOURCE AND CONSTRUCTION OF DUTIES

37.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

38.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also id.* § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function . . . ."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

[T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market-efficiency concepts

> and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled-investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

*Id.*, ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

39.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 288 (D. Mass. 2008) (quoting *Howard*, 100 F.3d at 1488). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983). Therefore a defendant "cannot claim as a defense … that a great deal of time was spent reviewing" a transaction which was "tainted by the fact that he did not have all of the information he needed" and was therefore "flawed from its inception." *Hall Holding Co.*, 285 F.3d at 431.

**CO-FIDUCIARY LIABILITY**

40.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C.

§ 1105(a) states, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a
> fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of
> another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act
> or omission of such other fiduciary, knowing such act or omission is a
> breach;
>
> (2)     if, by his failure to comply with section 1104(a)(1) of this title in the
> administration of his specific responsibilities which give rise to his status
> as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

**PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN**

41.     In a defined contribution plan, fiduciaries are obligated to assemble a diversified

menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Plan

participants may invest in any of these "designated investment alternatives" that fiduciaries

include within the plan's menu of investment options.[1]

42.     Each investment alternative within a defined contribution plan is generally a

pooled investment product—which includes mutual funds, collective investment trusts, and

separate accounts—offering exposure to a particular asset class or sub-asset class. INVESTMENT

COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at*

*401(k) Plans*, at 7 (Dec. 2014), *available at* www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf

("2014 ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem*

---

[1] A "designated investment alternative" is defined as "any investment alternative designated by
the plan into which participants . . . may direct the investment of assets held in, or contributed to,
their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

*of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

43.     The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate. Stable value funds, guaranteed investment contracts, and money market funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the default risk associated with the particular borrower. Equity (or "stock") investments obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company.

44.     Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.* growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks,  value stocks, and companies in between).

45.     Balanced funds are a type of mutual fund that invests in a mix of stocks and bonds. Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

46.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or

quarterly basis. For example, within each of the Huntington funds offered in the Plan, management fees were deducted regularly and paid to Huntington's subsidiaries.

47.     Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized). U.S. DEP'T OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

## MINIMIZATION OF PLAN EXPENSES

48.     At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan*

17

*Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[2] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. DEP'T OF LABOR, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

49.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. INVESTMENT COMPANY INSTITUTE & DELOITTE CONSULTING LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees*, at 17 (Aug. 2014), *available at* www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf ("ICI/Deloitte Study"). Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

50.     Administrative expenses (*e.g.*, recordkeeping, trustee and custodial services, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers

---

2 The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp.

typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula. Although revenue sharing arrangements are not necessarily prohibited transactions under 29 U.S.C. § 1106, plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed Plan." DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

51.     Prudent fiduciaries exercising control over administration of a plan and the selection and monitoring of core investment options will minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors. *See* CONSUMER REPORTS, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. DEP'T OF LABOR, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In

19

2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.44% for plans with between $500 million and $1 billion in assets. 2014 ICI Study at 41.

52.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

### MANAGEMENT OF PLAN INVESTMENT OPTIONS

53.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan and monitoring the plan's existing investments.

54.     The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. PA. L. REV. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Contribution Plans*, 91 AM. ECON. REV. 79, 96 (2001).

55.     Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years). For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments and will remove imprudent investments rather than relying on participants to move their money out of an imprudent investment. The fact that participants exercise "independent control" over the assets in their accounts "does not serve

to relieve a fiduciary from its duty to prudently select and monitor any … designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(1)(iv).

56.     The second critical insight provided by academic and financial industry literature is that in selecting prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper Is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper Is Better*"); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").  As one scholarly article notes:

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper Is Better*, at 883.

57.     While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain

almost all of the predictability in mutual fund returns"). Any sustainable ability to beat the market that managers might demonstrate is generally dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose management, research and analytical capabilities, and long-term track record permit a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

58.    Mutual fund companies possess no special insight that allows them to identify which of their own funds are likely to outperform in the future. Though mutual fund companies acting as service providers tend to favor retention of their own funds, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. OF FIN. 1779 (Aug. 2016). A study of third-party administrators similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns are attributable to the use of proprietary mutual funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. OF FIN. RES. 5 (Spring 2016).

## DEFENDANTS' VIOLATIONS OF ERISA

**I.    DEFENDANTS' PROCESS FOR SELECTING SERVICE PROVIDERS AND INVESTMENTS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST.**

59.    Defendants constructed and maintained the Plan unlike any fiduciary of a similarly-sized plan. Defendants' selections generated high costs for the Plan and siphoned assets from Plan participants to Huntington. Defendants' process for administering the Plan, selecting and monitoring service providers and investments, and controlling the Plan's costs failed to comply with ERISA's standard of care.

60.    The Plan is a "large" plan in the defined contribution plan marketplace. Since 2011, the Plan has had between $360 million and $775 million in assets and between 9,700 and 19,400 participants, and has consistently ranked in the top half of the 99th percentile of all defined contribution plans by size.[3]

*Illustration 1: Plan Participants and Assets*

|  | Participants | Total Assets[4] |
|---|---|---|
| **2011** | 9,723 | $362,373,292 |
| **2012** | 9,786 | $422,963,247 |
| **2013** | 10,713 | $552,596,296 |
| **2014** | 14,304 | $613,416,072 |
| **2015** | 15,354 | $659,441,247 |
| **2016** | 19,337 | $770,247,440 |

[3] At the end of 2011, there were approximately 638,000 defined contribution plans. Only 2,306 had more than 5,000 participants, and only 1,834 had more than $250 million in assets. U.S. DEP'T OF LABOR, *Private Pension Plan Bulletin*, at 11-12 (Sept. 2014), *available at* www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/2011pensionplanbulletin.pdf. At the end of 2013, there were approximately 637,000 defined contribution plans. Only 1,191 had more than 10,000 participants, and only 1,249 had more than $500 million in assets. U.S. DEP'T OF LABOR, *Private Pension Plan Bulletin*, at 11-12 (Sept. 2015), *available at* www.dol.gov/sites/default/files/ebsa/researchers/statistics/retirement-bulletins/2013pensionplanbulletin.pdf.
[4] The Plan's assets invested in pooled investment vehicles (i.e., excluding Huntington stock and loan receivables) have at all relevant times exceeded $250 million, and surpassed $500 million in 2015.

61.     Based on the bargaining power of large plans and the abundance of competition for services to such plans, large plans are able to obtain administrative and investment services at rates far lower than smaller plans. The average "all-in" cost for plans with between $250 million and $500 million in assets was 53 basis points in 2009, 48 basis points in 2012, and 47 basis points in 2014. During the same period, the average plan with between $500 million and $1 billion in assets cost between 46 basis points and 43 basis points. In contrast, among all plans with more than 100 participants, the average plan's costs were much higher, between 102 and basis points and 92 basis points.[5]

62.     As of the end of 2011, Defendants offered 21 pooled investment options within the Plan, and 16 were managed by Huntington's subsidiaries: the Huntington Conservative Deposit Account, the Huntington Situs Fund, the Huntington Fixed Income Securities Fund, the Huntington Income Equity Fund, the Huntington Growth Fund, the Huntington Intermediate Government Income Fund, the Huntington International Equity Fund, the Huntington Dividend Capture Fund, the Huntington Mid Corp America Fund, the Huntington Rotating Markets Fund, the Huntington U.S. Treasury Money Market Fund, the Huntington Real Strategies Fund, the Huntington Money Market Fund, the Huntington Balanced Allocation Fund, the Huntington Growth Allocation Fund, and the Huntington Conservative Allocation Fund. Defendants also engaged Huntington's subsidiary HNB to perform recordkeeping services for the Plan.

63.     Although using proprietary options is not a breach of the duty of prudence or loyalty in and of itself, a plan fiduciary's selection and retention process must comply with

_____

[5] 2014 ICI Study at 41; INVESTMENT COMPANY INSTITUTE, *The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans*, at 49 (Dec. 2016), *available at* www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf ("2016 ICI Study"). Cost estimates are generally limited to plans with more than 100 participants due to relaxed public disclosure requirements for very small plans. *Id.*, at 12. The estimable market of plans with more than 100 participants is itself the top decile of all defined contribution plans. *Id.*, at 11-12.

ERISA's standard of care. Comparing the Plan to similarly-sized plans and their selections and costs, Defendants' process was imprudent and showed an improper preference for Huntington products and services.

64. Fiduciaries of other plans in the segment of the market occupied by the Plan overwhelmingly rejected Huntington's products and services for their plans. Based upon a review of publicly filed Form 5500s from the 2011 plan year for plans with over $250 million in assets, Plaintiffs are not aware of any defined contribution plan other than the Plan that offered Huntington mutual funds or the Huntington Conservative Deposit Account as of the beginning of 2012. Based upon a similar review, Plaintiffs are not aware of any plans with over $250 million in assets (other than the Plan) for which HNB was recordkeeper.

65. Despite the widespread rejection of Huntington's proprietary products and services in the large retirement plan marketplace occupied by the Plan, Defendants retained each offering within the Plan in 2012. This action was a benefit to Huntington and a detriment to Plan participants. Huntington's products and services were materially more expensive than alternatives available in the marketplace. For example, in 2012, Huntington's mutual funds included within the Plan's investment lineup were 58% to 340% more expensive than the average fund in the same asset class offered by similarly-sized plans.

*Illustration 2: Average Mutual Fund Costs vs. Huntington Fund Costs*

|  | ICI Average $250MM - $500MM[6] | Huntington Funds in the Plan | Huntington's Excess |
|---|---|---|---|
| **Domestic Equity** | 57 bps | 90 bps - 143 bps | 58% - 151% |
| **International Equity** | 72 bps | 161 bps | 124% |
| **Domestic Bond** | 41 bps | 105 bps - 108 bps | 156% - 163% |
| **Balanced** | 45 bps | 190 bps | 322% |
| **Money Market** | 20 bps | 74 bps - 88 bps | 270% - 340% |

66.    The administrative costs imposed by HNB were also excessive. HNB charged fees to participants directly and retained additional "indirect compensation" or "revenue sharing" payments from the Plan's investment funds. For prudently monitored plans, revenue sharing payments present an opportunity to offset fees that would otherwise be charged to the plan. Revenue sharing payments can also be reallocated to participant accounts (representing the reimbursement of certain investment fees paid by the participants).[7] Defendants, however, used these payments to obtain a windfall for Huntington. Plaintiffs estimate that Huntington received compensation from all sources equal to $82 per participant for administrative services in 2012.[8] According to Plaintiffs' counsel's investigation, a plan the same size as the Plan should have been able to obtain excellent administrative services of the same or superior quality for between $45 and $55 per participant.

[6] 2014 ICI Study at 45.

[7] Monitoring revenue sharing payments is a necessary, but not sufficient, measure taken by prudent fiduciaries. Investment funds that make high revenue sharing payments may be imprudent for a plan. A fund first must be prudently selected, and then any revenue sharing payments must be carefully monitored and distributed. *See* DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *5-*6 (June 25, 2003).

[8] The actual amount of indirect compensation retained by HNB has not been disclosed. Defendants reported $306,379 in direct payments to HNB and indicated that additional indirect payments were received but the amount or formula would not be disclosed pursuant to an exception in DOL reporting rules. Plaintiffs estimated the indirect payments based on the Plan's investment fund balances and the revenue sharing rates paid by the fund managers to other plans that did disclose the payment rates.

67.    Defendants' retention of high cost proprietary products and services resulted in excessive costs for the Plan and the inappropriate transfer of assets from participants' accounts to Huntington. As a percentage of all non-stock assets, the Plan's costs in 2012 were 44% higher than the average plan with between $250 million and $500 million in assets.[9] Most of those fees went to Huntington.

68.    A prudent and loyal fiduciary process requires cost benchmarking, investigation of options in the marketplace, and affirmative steps to limit participants' costs. A fiduciary should regularly monitor investment options and compare investment fees to the fees paid by similar plans for similar investment products and services. A fiduciary should also be familiar with the relationship between high costs and investment returns (see *supra*, ¶¶ 56-57) and pursue a menu of competitively-priced investment options. In regards to administrative services, a fiduciary should submit requests for proposals (RFPs) to potential service providers every few years to obtain competitive information and survey alternatives. A fiduciary should use the RFP process to make appropriate changes to keep plan costs in line with the marketplace.

69.    Based on the allegations set forth above (and throughout this Complaint), Defendants failed to establish or maintain a prudent and loyal process for selecting and monitoring services providers and investments and controlling the Plan's costs. Instead,

---

[9] As a percentage of all assets, the Plan's costs' were 25% higher (60 basis points versus 48 basis points) than the average similarly-sized plan measured by ICI. *See* 2014 ICI Study at 41. The Plan's costs are understated by using all assets, because the Plan held a disproportionally large share of assets in the sponsor's (Huntington's) stock. The Plan held 22.5% of its assets in the sponsor's stock, compared to only 10.3% in similarly-sized plans. *Id.*, at 56. A company stock option in a defined contribution plan has significantly lower fees than other options; therefore, including these assets in a total cost analysis understates the effect of fees on plans with outsized company stock holdings. Excluding company stock from total assets, the Plan's costs were 78 basis points in 2012, compared to 54 basis points for the average plan—a 44% premium paid by the Plan.

Defendants' process was slanted in favor Huntington products and services to the detriment of Plan participants.

## II. DEFENDANTS USED THE PLAN TO SUSTAIN AND LEVERAGE HUNTINGTON'S MUTUAL FUND BUSINESS, TO THE DETRIMENT OF THE PLAN.

70. Defendants did not become more diligent or cost-conscious after 2012. Defendants continued to offer Huntington's funds in the Plan and use HNB for administrative services to the Plan. The costs of Huntington's products and services remained excessive compared to alternatives available to the Plan, and fiduciaries of similar plans continued to reject Huntington for their plans.

71. In fact, Huntington's failure to compete caused Huntington to retreat from its mutual fund business in order to focus on business segments where Huntington had greater expertise. In the winding-down process, Huntington's business concerns influenced Defendants' actions with respect to the Plan. As the parts of Huntington's mutual fund business were re-arranged, closed, or sold, Defendants delayed divestment from Huntington funds and managed the Plan's investment menu in other ways that promoted Huntington's business interests but did damage to Plan participants.

72. In the first series of changes, Huntington merged funds "in-house" and closed others. These actions were intended to reduce the costs of operating the mutual fund business for Huntington and increase Huntington's profits. Huntington closed the Huntington Growth Fund, merged the Huntington Mid Corp America Fund into the Huntington Situs Fund, merged the Huntington Income Equity Fund into the Huntington Dividend Capture Fund, and closed the Huntington Rotating Markets Fund. Retaining assets under management before and after these reorganizations served Huntington's interests in maximizing revenue and profits.

73.     In each case, Defendants retained the closed or merged fund within the Plan long after a prudent fiduciary would have replaced the fund with a superior alternative.[10] Defendants retained the Huntington Growth Fund and Huntington Rotating Markets Fund until the funds were closed. Defendants retained the Huntington Mid Corp America Fund and the Huntington Income Equity Fund until the funds were merged with the Huntington Situs Fund and Huntington Dividend Capture Fund, respectively. In each case, before the mergers were completed, a prudent fiduciary would have evaluated other marketplace alternatives, to ensure it was in the best interests of Plan participants to have their assets transferred to the successor Huntington fund. But in every case, the Plan's fiduciaries lay dormant, simply allowing the Plan's assets to transfer into the surviving Huntington funds, causing participants invested in the merged funds to shift their investments from one Huntington fund to another Huntington Fund.

74.     The Plan's assets represented a sustaining investment of 5 to 25 percent of each fund on the decline (or that Huntington hoped to revive).[11] Defendants' promotion of proprietary funds despite the availability of superior options in the marketplace elevated Huntington's interests above the interests of Plan participants, and participants suffered.[12]

---

[10] There were dozens of funds outside the Huntington complex that employed similar strategies to the Huntington funds and had lower expense ratios and generated consistently higher returns. Fiduciaries of similarly-sized plans selected these funds to the exclusion of Huntington's funds.

[11] Mutual funds benefit from economies of scale. In addition to reducing Huntington's revenue, loss of a significant investor like the Plan would have made it more difficult for Huntington to maintain fee levels and retain other investors.

[12] Retention of Huntington's funds also preserved revenue sharing payments made by the funds to HNB for administrative services to the Plan. This revenue sharing arrangement continued to generate excessive fees for HNB. Plaintiffs' estimate that HNB's total compensation in 2013 was $83 per participant, approximately two times the cost level Defendants could have obtained if they had undertaken a competitive bidding process. Defendants have made conflicting statements about the duration of these revenue sharing arrangements. In a filing dated October 13, 2015, Defendants stated that revenue sharing arrangements had been terminated, but in the Plan's next filing on October 14, 2016, Defendants stated that HNB received revenue sharing payments.

*Illustration 3: Funds Closed or Merged In-House, 2013-2014*

| | Underperformance in Calendar Year Preceding Merger or Closure | Average Underperformance in Five Calendar Years Preceding Merger or Closure | Plan's Share of Fund at End of Calendar Year Preceding Merger or Closure |
|---|---|---|---|
| **Huntington Income Equity Fund**[13] | -7.80% | -0.03% | 9.55% |
| **Huntington Growth Fund**[14] | -4.30% | -6.22% | 8.73% |
| **Huntington Mid Corp America Fund**[15] | -3.18% | -2.48% | 5.73% |
| **Huntington Rotating Markets Fund**[16] | -8.60% | -3.19% | 24.48% |

*Illustration 4: Surviving Funds after In-House Mergers*

| | Underperformance in Calendar Year of Merger | Underperformance in Calendar Year Following Merger | Plan's Share of Fund at End of Calendar Year Following Merger |
|---|---|---|---|
| **Huntington Dividend Capture Fund**[17] | -11.25% | -4.10% | 14.72% |
| **Huntington Situs Fund**[18] | -5.12% | -11.18% | 17.20% |

75.     The second strategy pursued by Huntington was the sale of assets associated with

its mutual business fund business. Selling off pieces of this "non-core" business allowed

---

[13] The prospectus benchmark used for comparison was the Standard & Poor's 500 Value Index.

[14] The prospectus benchmark used for comparison was the Standard & Poor's 500 Growth Index.

[15] The prospectus benchmark used for comparison was the Standard & Poor's MidCap 400 Index. Another benchmark identified in the fund's prospectus was the Russell Midcap Index. The fund underperformed this index by 2.58% and 0.90% over the relevant periods noted.

[16] The prospectus benchmark used for comparison was the Standard & Poor's 500 Index.

[17] The prospectus benchmark used for comparison was the Standard & Poor's 500 Index. Another benchmark identified in the fund's prospectus was a custom benchmark constructed by HAA called the Dividend Capture Indices Blend (DCIB). The fund outperformed this benchmark by 9.23% in 2013 and underperformed by 7.44% in 2014.

[18] The prospectus benchmark used for comparison was the Standard & Poor's MidCap 400 Index. Another benchmark identified in the fund's prospectus was Standard & Poor's Small-Cap 600 Index. The fund underperformed this index by 12.93% in 2013 and 7.17% in 2014.

Huntington to generate immediate income to use to develop Huntington's core businesses.[19] The more mutual fund assets Huntington had under management and was able to transfer, the higher the prices Huntington could demand from potential buyers. The prospective sales aggravated Defendants' conflict of interest with respect to control of the Plan's investment menu. Defendants, however, took no steps to avoid this conflict.

76.     The first piece Huntington sold was a portfolio of bond funds. On May 16, 2014, Huntington sold assets relating to the management of the portfolio to Federated Investors Inc. for an undisclosed amount. The sale included the Huntington Intermediate Government Income Fund and Huntington Fixed Income Securities Fund. Defendants retained these funds within the Plan until the sale closed. As part of the sale, Federated reorganized the assets previously held in the Huntington funds into pre-existing Federated funds. Defendants then retained Federated's funds in the Plan. The Plan's assets previously invested in the Huntington Fixed Income Securities Fund were transferred to the Federated Bond Fund. The Plan's assets previously invested in the Huntington Intermediate Government Income Fund were transferred to the Federated Total Return Government Bond Fund.

77.     Defendants acted in pursuit of Huntington's interests and abdicated their duties with respect to the Plan in connection with the Federated transaction. In addition to charging high fees and being rejected by fiduciaries of similar plans, the Huntington bond funds underperformed their benchmarks. A prudent fiduciary would have replaced these funds with superior alternatives in the marketplace long before the Federated sale, but Defendants retained the Plan's investments to serve Huntington's interest in maximizing the value of Huntington's

---

[19] Huntington Bancshares Incorporated Fourth Quarter 2015 Earnings Conference Call, at 07:09-07:50 (Jan. 21, 2016), *available at* http://www.huntington-ir.com/confcall/2015.htm.

assets associated with the funds. The Plan owned 5 to 10 percent of the funds' shares, and the sale price received by Huntington (and Huntington's revenue prior to the sale) would have decreased if Defendants had divested the Plan of the funds before the sale.

*Illustration 5: Huntington Bond Funds Prior to Sale to Federated*

| | Underperformance in Calendar Year Preceding Sale | Average Underperformance in Five Calendar Years Preceding Sale | Plan's Share of Fund at End of Calendar Year Preceding Sale |
|---|---|---|---|
| **Huntington Intermediate Government Income Fund**[20] | -1.31% | -0.14% | 9.35% |
| **Huntington Fixed Income Securities Fund**[21] | -0.06% | -0.66% | 6.64% |

78.     After the sale, Defendants failed to conduct a prudent or objective investigation of the marketplace to determine how best to invest the Plan's assets previously invested in Huntington's bond funds. Instead, Defendants simply substituted Federated for Huntington as the manager of these assets.[22] Defendants failed to consider whether the investment mandates followed by Federated's funds were appropriate for participants whose investments were transferred to Federated. The investment mandates pursued by the Federated funds were

---

[20]  The prospectus benchmark used for comparison was the Barclay's Intermediate Government/Credit Index.
[21]  The prospectus benchmark used for comparison was the Barclay's Government/Credit Bond Index.
[22]  Typically when an asset manager sells a portfolio but retains control of certain assets included in the portfolio, the transaction includes an understanding that the portfolio's assets will not be promptly reduced by subsequent action of the seller. The negotiations and terms of the sale of Huntington's bond funds to Federated have not been publicly disclosed. However, the prior and subsequent actions of Huntington imply that Defendants were constrained in their control of the Plan's bond investment options after the sale.

narrower than the bond strategies more commonly utilized within similar plans.[23] Defendants'
action concentrated the Plan's assets invested in bond funds into a few types of bonds (and
higher-risk bonds in the case of the Federated Bond Fund), a result that deviated from the menu
construction and asset distribution of similar plans. A fiduciary free of conflicts of interest would
have been unlikely to transfer investments in Huntington's bond funds to the Federated options
after the sale (or retain the Federated funds at all).

79.     If a disinterested fiduciary had considered bond funds with mandates similar to
the Federated funds, the Federated funds would not have been the best options in the marketplace
for the Plan. As an example, the PIMCO Investment Grade Corporate Bond Fund has a similar
objective to the Federated Bond Fund, but cost substantially less (50 bps versus 79 bps in the
year of the transaction) and was superior to the Federated fund based on additional factors like
manager tenure and long-term performance. Not surprisingly, the PIMCO fund has outperformed
the Federated fund since Defendants' mapped the Plan's assets to the Federated fund. The DFA
Intermediate Government Fixed Income Portfolio has a similar objective to the Federated Total
Return Government Income Fund, but cost substantially less (13 bps versus 31 bps in the year of
the transaction) and was superior to the Federated fund based on additional factors like manager
tenure and long-term performance. Not coincidentally, the DFA fund has outperformed the
Federated fund since Defendants' mapped the Plan's assets to the Federated fund. Defendants'

---

[23] Only one plan with more than $500 million in assets (the Plan) offered the Federated Bond
Fund, and only three (including the Plan) offered the Federated Total Return Government Bond
Fund. In contrast, approximately 540 such plans included the Vanguard Total Bond Market
Index Fund. This fund invests in multiple categories of bonds, instead of one category like the
Federated funds. The fund is more widely used because its broad investment mandate better
balances the goals of participants who choose a bond fund (in addition to other advantages like
low fees). Defendants added the Vanguard Total Bond Market Index Fund as an option within
the Plan in 2013 and could have mapped participant accounts previously in Huntington's bond
funds to the more widely-used Vanguard strategy. However, Defendants directed these assets to
its transaction partner, Federated, because that action was better for Huntington.

decision to use the Federated bond funds after the sale was not objective and did not serve the interests of Plan participants.

80.     Huntington sold the remaining pieces of its mutual fund business in 2015.[24] For Huntington's money market funds, Huntington again dealt with Federated.[25] The Huntington U.S. Treasury Money Market Fund was reorganized into the Federated Treasury Obligations Fund. The Huntington Money Market Fund was liquidated and investors were encouraged to re-invest in Federated funds. In connection with the sale, Defendants moved all assets of the Plan previously invested in Huntington's money market funds into the Federated Treasury Obligations Fund.

81.     A prudent fiduciary would have removed the Huntington money market funds long before the sale and would not have selected the Federated Treasury Obligations Fund as a replacement (see below for further discussion of Defendants' flawed management of the Plan's principal preservation options). However, Defendants acted in Huntington's interests, not the interests of participants. By retaining Huntington's money market funds before the sale and the successor fund after the sale, Defendants increased the value of the transaction to Huntington.

82.     In a separate transaction with Catalyst Funds, Huntington sold HAA altogether, transferring control of HAA and Huntington's remaining mutual funds to Catalyst on December

---

[24] Like the prior transaction, the terms and negotiations of the 2015 transactions were not made public. However, the prior and subsequent actions of Huntington imply that Defendants were constrained in their control of the Plan's investment options immediately after the sales. *See supra* n. 22.

[25] *See* FEDERATED INVESTORS, *Federated Investors' Money Market Funds to Acquire Approximately $1.1 Billion in Assets from Huntington Money Market Funds* (Sept. 9, 2015), *available at* http://www.federatedinvestors.com/FII/daf/pdf/about_federated/press_releases/2015/090915_Federated_Huntington_FINAL.pdf; FEDERATED INVESTORS, *Federated Investors, Inc. Completes Transition of Assets into Federated Money Market Funds* (Dec. 7, 2015), *available at* http://www.federatedinvestors.com/FII/daf/pdf/about_federated/press_releases/2015/120715_Federated_Huntington_FINAL.pdf.

31, 2015.[26] This sale included the Huntington Dividend Capture Fund, the surviving fund after its merger with the Huntington Income Equity Fund in 2013 (see *supra*, ¶¶ 72-74, illus. 3-4). Catalyst rebranded this fund the Rational Dividend Capture Fund. Defendants retained the Plan's investment in the Huntington fund until the sale closed, and Defendants retained the Rational fund after the sale.

83.     Defendants retained the Huntington/Rational Dividend Capture Fund long after a prudent fiduciary would have removed the fund or replaced it with a superior alternative. The fund underperformed its benchmark and charged excessive fees compared to similar funds in the marketplace.[27] Research firm Morningstar ranked the fund ***last*** out of 927 similar funds over the last five years. The only reason Defendants retained this fund was to serve Huntington's interest in collecting revenue and maximizing the price received for HAA and its remaining portfolio of funds. The Plan's investment represented more than 25 percent of the fund at the time of the sale to Catalyst, and retaining the Plan's investment increased Huntington's revenue and the profits received in connection with the Catalyst transaction.

---

[26] CATALYST FUNDS, *Catalyst to Acquire Huntington Asset Advisors from Huntington Bank* (Sept. 9, 2015), *available at* catalystmf.com/spotlights/view/1221/catalyst_to_acquire_huntington_asset_advisors_from_huntington_bank.

[27] The average domestic equity fund offered in 401(k) plans cost 48 bps in 2015 and 45 bps in 2016, reflecting an overall trend toward lower fees. *See* ICI RESEARCH PERSPECTIVE, vol. 23 no. 4, at 12 (June 2017), *available at* https://www.ici.org/pdf/per23-04.pdf. The Huntington/Rational Dividend Capture Fund cost 88 bps in 2015 and 100 bps in 2016—83% to 122% more expensive than the average similar fund (and trending in the opposite direction of the marketplace). Yet, Defendants retained the Huntington/Rational Dividend Capture Fund until the third quarter of 2017, when it was belatedly replaced with a superior alternative. The replacement, the Vanguard Equity Income Fund, cost only 17 bps and, not coincidentally, generated 5.16% higher average returns between 2012 and 2016 than the Huntington/Rational fund.

*Illustration 6: Huntington/Rational Dividend Capture Fund—Plan's Share of the Fund vs. Benefit of the Fund to the Plan*

|  | Plan's Share of Fund at Time of Catalyst Sale | Average Underperformance 2012-2016 |
|---|---|---|
| **Huntington Dividend Capture Fund (Rational Dividend Capture Fund)[28]** | 25.84% | -6.04% |

84.     Huntington's transaction with Catalyst also included the Huntington Real Strategies Fund, which was also rebranded under the Rational name. Defendants retained the Plan's investment in the Huntington fund until the sale closed, and retained the Rational fund after the sale. This fund was structurally imprudent and should have been removed long before the sale. The fund pursued high-risk strategies by investing in specific industries like energy, agricultural products, and minerals. Sector-specific strategies typically reduce, rather than enhance, a portfolio's level of diversification. Such funds also encourage speculation and return-chasing by participants, behavioral tendencies that studies have shown tend to result in negative performance outcomes. Despite these issues, Defendants failed to conduct any investigation or review to determine whether inclusion of this option was benefiting participants. In fact, the fund generated negative average returns for the Plan over the entire lifetime of the fund. Defendants retained this fund only to serve Huntington's interest in maximizing Huntington's revenue and the value of the Catalyst transaction. The Plan's investment represented more than 31 percent of the fund at the time of the sale to Catalyst.

---

[28] The prospectus benchmark used for comparison was the Standard & Poor's 500 Index. The relevant returns were identical for the Standard & Poor's 500 Total Return Index identified in the fund's prospectuses after Catalyst assumed control of the fund.

*Illustration 7: Huntington/Rational Real Strategies Fund—Plan's Share of the Fund vs. Benefit of the Fund to the Plan*

| | Plan's Share of Fund at Time of Catalyst Sale | Average Return - Fund Inception through End of 2016[29] |
|---|---|---|
| **Huntington Real Strategies Fund (Rational Real Strategies Fund)** | 31.51% | -4.04% |

85. These examples illustrate Defendants' imprudent and self-serving management of the Plan during the time Huntington attempted to sustain and leverage its failed mutual fund business.[30] Defendants delayed or refrained from taking steps a prudent and loyal fiduciary would take to investigate the marketplace and select investment options best suited to the goals of the Plan and participants. Defendants' conduct violated ERISA's standard of care and cost the Plan tens of millions of dollars in excess fees and lost returns.

**III. DEFENDANTS FAILED TO PURSUE A PRUDENT PRINCIPAL PRESERVATION INVESTMENT OPTION FOR THE PLAN IN DEFERENCE TO HUNTINGTON'S BUSINESS INTERESTS.**

86. A diversified menu of choices in a defined contribution requires a "principal preservation" option that seeks to protect investors' principal while generating regular income.

---

[29] The inception date of the Huntington/Rational Real Strategies Fund was May 1, 2007. Defendants belatedly removed the fund from the Plan in the second half of 2016, after at least two quarters under Catalyst's management.

[30] These examples are only the tip of the iceberg of all conflicted and imprudent decisions made by Defendants during the relevant time. Defendants also offered Huntington's experimental line of asset allocation funds, which cost four times more than the average similar fund and were not geared toward institutional investors like the Plan. Defendants only removed these funds after they failed to gain traction. Defendants retained the Huntington International Equity Fund until it was merged with another fund. The Huntington International Equity Fund cost more than twice the average similar fund and underperformed its benchmark over the five years before it was removed. Defendants retained the Huntington Situs Fund until 2015 despite excessive fees and long-term underperformance. The fund was only removed after it lost money in 2014 (even though the fund's benchmark indices performed well) and suffered a catastrophic quarter in 2015 during which it lost another 11.17% of its net asset value.

Defendants have used this position in the Plan's investment lineup to promote Huntington's interests at the expense of participants.

87.     The Plan's principal preservation options prior to December 2015 were the Huntington Conservative Deposit Account,[31] Huntington Money Market Fund, and Huntington U.S. Treasury Money Market Fund. After Huntington sold its money market funds to Federated, the principal preservation options were the Huntington Conservative Deposit Account and the Federated Treasury Obligations Fund. In 2016, Defendants consolidated the Plan's principal preservation assets into the Federated Treasury Obligations Fund.[32]

88.     The Huntington Conservative Deposit Account is a deposit account held by HNB. The account pays interest at HNB's discretion. HNB uses deposits to earn profits for Huntington through lending and investment activities. The Huntington Money Market Fund and Huntington U.S. Treasury Money Market Fund invested in short-term U.S. Treasury notes or other short-term obligations. After Huntington's management fees, these funds returned the interest income, if any, earned from the notes. The Federated Treasury Obligations Fund is the successor to the Huntington money market funds. This fund also invests in short-term U.S. Treasury notes and returns the interest income to participants, after Federated's management fees.

89.     Each of these options was imprudent and served the interests of Huntington in generating profits and goodwill for Huntington. Between 2012 and 2016, the Plan's principal

---

[31] Defendants compounded their disloyalty prior to 2014 by making the Conservative Deposit Account the default investment for participants who did not make an election. A 2012 survey found that only 5 percent of plans designated a principal preservation option as the default investment. DELOITTE, *Annual 401(k) Benchmarking Survey*, at 11 (2012 ed.), *available at* www.iscebs.org/Resources/Surveys/Documents/401kbenchmarkingsurvey2012.pdf. Most plans designated an option with more growth potential. *Id.*

[32] In 2016, a federal judge found that inclusion of a proprietary deposit account similar to the Huntington Conservative Deposit Account within a 401(k) investment menu would "probably" result in fiduciary liability. *See Ortiz v. Am. Airlines, Inc.*, 4:16-cv-151, 2016 WL 8678361, at *10 (N.D. Tex. Nov. 18, 2016). The case remains pending as of the filing of this Complaint.

preservation options returned between 0.00% and 0.19% per year. These miniscule returns, which often failed to keep pace with inflation, were predictable to investment analysts who studied the expected earnings of the underlying securities. Experts have therefore stated for years that the principal preservation options within defined contribution plans should include other investment vehicles like stable value funds. Stable value funds also provide preservation of principal and have consistently generated meaningful returns for investors.[33]

90.    Given the superior yields offered by stable value funds at comparable levels of risk, large plans overwhelmingly offer stable value funds over money market funds. *See* Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), *available at* http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30. "With yields hovering around 0%, money-market funds aren't a prudent choice for a 401(k)." *Id.* "Most [defined contribution] plans offer a stable value option." METLIFE, *2015 Stable Value Study*, at 3 (2015), *available at* https://www.metlife.com/assets/cao/institutional-retirement/plan-sponsor/stable-value/Stable-Value-Vs-Money-Market/2015_StableValueStudy_exp12-2017.pdf

---

[33] *See Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plan and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006). Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), *available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf. A 2011 study from Wharton Business School, analyzing money market and stable value fund returns from the previous two decades, went so far as to conclude that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011), *available at* http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf.

91.     The returns that could have been achieved by transferring the Plan's principal preservation investments to a competitive stable value option are illustrated by data from Hueler Analytics. The Hueler Index is the industry standard for reporting and measuring returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds nationwide with assets totaling over $105 billion." *See* http://hueler.com. Hueler data therefore represents a reasonable estimate of the returns of a typical stable value fund. As shown below, the returns of the funds in the Hueler universe on average have far exceeded the returns of the principal preservation options offered to Plan participants by Defendants.

***Illustration 8: Hueler Index vs. the Plan's Principal Preservation Options***

| | Hueler Index | Huntington Conservative Deposit Account[34] | Huntington Money Market Fund | Huntington U.S. Treasury Money Market Fund | Federated Treasury Obligations Fund |
|---|---|---|---|---|---|
| 2012 | 2.26% | 0.08% | 0.01% | 0.01% | 0.01% |
| 2013 | 1.84% | 0.06% | 0.01% | 0.04% | 0.01% |
| 2014 | 1.69% | 0.00% | 0.01% | 0.03% | 0.01% |
| 2015 | 1.77% | 0.05% | -- | -- | 0.01% |
| 2016 | 1.79% | -- | -- | -- | 0.19% |

92.     Defendants have dealt in Huntington's interests four times over by failing to investigate a stable value option for the Plan. The four options that have served as principal perseveration options for participants were selected or retained to benefit Huntington. The Huntington money market funds paid virtually all interest income to Huntington in the form of fees. Huntington used Plan asset in the Huntington Conservative Deposit Account for Huntington's banking business while paying Plan participants as little as possible in interest. The

---

[34] Returns were calculated based on the income from this asset reported on the Plan's annual 5500 filings.

successor option managed by Federated was selected and retained by Defendants solely because Huntington's transactions with Federated were more favorable to Huntington as a result of Huntington placing and retaining assets with Federated. Defendants have cost Plan participants millions of dollars in lost earnings by failing to pursue a prudent option in the marketplace for preservation of principal.

## IV. PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

93.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, the absence of Huntington products and services in similar plans, the costs of the Plan's investments compared to those in similarly-sized plans, the total revenue received by HNB for administrative services inclusive of revenue sharing, the excessiveness of HNB's compensation compared to alternative service providers, the overall costs of the Plan compared to similarly-size plans, and the availability of superior options that satisfied the goals of the Plan) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating and removing Plan investments; Defendants' processes for selecting and monitoring the Plan's recordkeeper; and the influence of Huntington's business transactions on Defendants' processes), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

42

## CLASS ACTION ALLEGATIONS

94.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

95.     Plaintiffs asserts their claims in Counts I–IV on behalf of a class of participants and beneficiaries of the Plan defined as follows:[35]

> All participants and beneficiaries of the Huntington Investment and Tax Savings Plan at any time on or after December 29, 2011, excluding Defendants and employees with responsibility for the Plan's investment or administrative functions.

96.     Numerosity:  The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 10,000 to 20,000 participants during the applicable period.

97.     Typicality:   Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

98.     Adequacy:   Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation.

---

[35] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

99.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.   Which Defendants are fiduciaries of the Plan;

    b.   Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

    c.   Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

    d.   Whether Huntington breached its duty to monitor other Plan fiduciaries;

    e.   Whether Defendants engaged in prohibited transactions in violation of 29 U.S.C. § 1106(a) and (b);

    f.   The proper form of equitable and injunctive relief;

    g.   The proper measure of monetary relief.

100.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

101.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan

44

fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

102.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29  U.S.C. § 1104(a)(1)(A)–(B)**

103.    Defendants are or were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

104.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

45

105.    The scope of the fiduciary duties and responsibilities of the Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. The Defendants were directly responsible for ensuring that the Plan's fees were reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

106.    As described throughout this Complaint, the Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's designated investment alternatives, by prioritizing Huntington's proprietary investments (and their successors) over superior available options, and by failing to critically or objectively evaluate the cost and performance of the Plan's investments in comparison to other investment options. Defendants imprudently and disloyally retained higher-cost Huntington, Rational, and Federated mutual funds despite the availability of lower-cost investments that offered comparable or superior investment management services. Defendants also failed to act as a prudent, disinterested fiduciary would have acted in securing a principal preservation option for the Plan. Defendants instead selected and retained options that benefited Huntington but offered little or no benefit to participants, compared to superior options available in the marketplace. Additionally, Defendants allowed the Plan to pay excessive administrative fees to HNB by failing to investigate the costs of unaffiliated service providers and permitting HNB to retain excessive revenue sharing payments. Further, Defendants failed to consider interests of

46

participants in deciding which investment strategies to offer and where to transfer assets invested in options eliminated from the Plan.

107.    Each of the above-mentioned actions and failures to act described in paragraph 106 and throughout the Complaint demonstrate Defendants' failure to make Plan investment decisions based solely on the merits of each investment and in the interest of Plan participants. These failures were flagrant and intentional.  Throughout the Class Period, Defendants' conduct and decisions were driven by their desire to drive revenues and profits to Huntington and to generally promote Huntington's business interests. Through these actions and omissions, the Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

108.    Each of the above actions and omissions described in paragraph 106 and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

109.    Each Defendant is personally liable, and the Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

47

110. Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Failure to Monitor Fiduciaries**

111. As alleged throughout the Complaint, Huntington is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21).

112. Huntington is responsible for appointing and removing Huntington Directors and members of any committees that serve a discretionary role with respect to Plan administration and investments (John Does 6-20).

113. Given that Huntington had overall oversight responsibility for the Plan, and the fiduciary duty to appoint and remove other fiduciaries of the Plan, Huntington had a fiduciary responsibility to monitor the performance of the other fiduciaries.

114. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

115. To the extent that Huntington's fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

48

116.    Huntington breached its fiduciary monitoring duties by, among other things:

    a.  Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

    b.  Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

    c.  Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

117.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses per year due to excessive fees and investment underperformance.

118.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Huntington is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

## <u>COUNT III</u>
### Prohibited Transactions with a Party in Interest
### 29 U.S.C. § 1106(a)(1)

119.    As a Plan employer, the Plan sponsor, and a service provider for the Plan, Huntington is a party in interest under 29 U.S.C. § 1002(14).

120.     As participating employers in the Plan and service providers for the Plan, HNB and HAA were also "parties in interest" under 29 U.S.C. § 1002(14).

121.     As described throughout the Complaint, the Defendants caused the Plan to utilize proprietary investment products and administrative services that generated revenue for Huntington, HNB, and HAA.

122.     On a regular basis throughout the relevant period, HAA deducted fees and expenses from the assets being held for the Plan that were invested in Huntington funds in return for the investment management services provided by HAA. Further, HNB used Plan assets invested in the Huntington Conservative Deposit Account to conduct the lending and investment activities of HNB and earn profits for HNB. Additionally, HNB received assets from participants' accounts and payment of investment fee reimbursements from HAA and other managers of Plan investments, ostensibly in exchange for administrative services provided by HNB to the Plan.

123.     These transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest, and a direct or indirect transfer of assets of the Plan to a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C) and (D).

124.     As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars in fees in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and their participants.

125.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions and disgorge all profits they earned in connection with the management of Plan assets or other services performed for the Plan in violation of 1106(a)(1).

50

<u>COUNT IV</u>
**Prohibited Transactions with a Fiduciary**
**29 U.S.C. § 1106(b)**

126.    As described throughout the Complaint, Huntington is a fiduciary of the Plan as

that term is used in 29 U.S.C. §§ 1002(21) and 1106(b).

127.    Defendants dealt with the assets of the Plan in Huntington's own interest and for

its own account, and caused Huntington to receive consideration for its own account in

transactions involving the assets of the Plan, see 29 U.S.C. § 1106(b)(1),(3), when Defendants

caused the Plan to pay excessive investment management and Plan administration fees to HAA

and HNB (whose revenue was received and accounted for as profits to Huntington); caused the

Plan to maintain investments in the Huntington Conservative Deposit Account and permitted

HNB to use those assets in its lending and investment activities (the profits of which accrued to

Huntington); and selected, retained, or transferred Plan investments in order to increase the value

of Huntington's mutual fund business upon disposition by Huntington. Defendants' actions

described in this paragraph and throughout this Complaint constituted prohibited transactions in

violation of 29 U.S.C. § 1106(b)(1) and (3) and caused significant losses to the Plan.

128.    Based on the foregoing facts and other facts set forth in the Complaint, all

Defendants are liable for violations of 29 U.S.C. § 1106(b) because they knowingly participated

in these prohibited transactions, and made no efforts to prevent these transactions despite having

knowledge that the prohibited transactions were taking place.

129.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are

liable to restore all losses suffered by the Plan as a result of the prohibited transactions and

disgorge all profits they earned as a direct or indirect result of the above-mentioned prohibited

transactions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that Defendants have breached their fiduciary duties under ERISA;

D.     A declaration that Huntington breached its fiduciary duty to monitor appointed fiduciaries;

E.     A declaration that Defendants violated 29 U.S.C. § 1106 by allowing the Plan to engage in prohibited transactions;

F.     An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

G.     An accounting for profits earned by Defendants and a subsequent order requiring Huntington to disgorge all profits received from, or in respect of, the Plan;

H.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to Huntington, HAA, or HNB a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Huntington and HNB to prevent their unjust enrichment from unlawful transactions involving the Plan;

I.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

J.     An award of pre-judgment interest;

K.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

L.     An award of such other and further relief as the Court deems equitable and just.

Dated: December 29, 2017

**BARKAN MEIZLISH HANDELMAN GOODIN DEROSE WENTZ, LLP**

By:  /s/Robert DeRose
Robert E. DeRose (OH #0055214)
250 E. Broad Street, 10 Floor
Columbus, OH 43215
Telephone: (614) 221-4221
Facsimile: (614) 744-2300
bderose@barkanmeislish.com

**NICHOLS KASTER, PLLP**
Kai H. Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
Brandon McDonough, MN Bar No. 0393259*
        * *pro hac vice applications forthcoming*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
cengstrom@nka.com
bmcdonough@nka.com

ATTORNEYS FOR PLAINTIFFS